IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

ASHLEY BARKEY,

               Plaintiff,

vs.

VETTER HEALTH SERVICES, INC.,
d/b/a Heritage Care Center,

               Defendant.

No. C15-34-LTS

**ORDER ON DEFENDANT'S
MOTION FOR SUMMARY
JUDGMENT**

---

## I.    INTRODUCTION

This case is before me on defendant's motion (Doc. No. 19) for summary judgment. Plaintiff has filed a resistance (Doc. No. 20) and defendant has filed a reply (Doc. No. 23). No party has requested oral argument and, in any event, I find that oral argument is not necessary. *See* N.D. Ia. L.R. 7(c). Therefore, the motion is deemed fully submitted on the parties' written submissions.

## II.    PROCEDURAL HISTORY

Plaintiff Ashley Barkey commenced this action on March 6, 2015, by filing a petition (Doc. No. 4) in the Iowa District Court for Hardin County. Barkey alleges that defendant Vetter Health Services, Inc., d/b/a Heritage Care Center (Heritage), wrongfully discharged her in violation of public policy. Heritage filed a notice of removal (Doc. No. 2) on April 21, 2015, invoking this court's diversity jurisdiction pursuant to 28 U.S.C § 1332(a). Heritage filed an answer (Doc. No. 8) on April 27, 2015, denying liability and raising various defenses. Heritage filed its motion for summary judgment on April 25, 2016. Trial is scheduled to begin August 29, 2016. Neither party has demanded a jury trial.

## III.   RELEVANT FACTS

Except as otherwise noted, the following facts are undisputed:

Heritage is a skilled nursing facility for the elderly.   Barkey was hired by Heritage as a charge nurse on October 6, 2010.   Her duties included performing nursing services and supervising other employees, including certified nursing assistants (CNAs). Her job description stated that she should "provide an atmosphere that promotes comfort, safety, a sense of well-being and above all, dignity in life, while providing excellent nursing services that exceed customer expectations."   Doc. No. 19-2 at 1-2.

Barkey had disciplinary issues while employed by Heritage.   Indeed, she admits the following statement: "During her approximately three year employment with Heritage, Barkey was disciplined repeatedly, both with verbal warnings and formal written warnings."   According to Heritage, the first incident of discipline occurred on May 13, 2011, when Heritage alleges that Ellen Hinrichs and Penny Havlik, both supervisors of Barkey, counseled Barkey regarding her workplace performance.   Barkey was allegedly criticized for her poor workplace attitude, including being "increasingly critical of fellow employees, exhibiting a negative and overall poor attitude and making inappropriate comments to coworkers."   Barkey denies that this counseling session took place.

Included in Barkey's employment records are "Building the Best of the Best" (BBB) performance reviews.   Barkey's first BBB review began on October 5, 2011, when Barkey completed the written portion of a BBB form.   Julie Russell, Heritage's Director of Nursing (DON), reviewed the form with Barkey on November 9, 2011. Barkey's review goals included, "help [with] shift processes and shift teamwork" and "help [with] communication process between shifts."   At the time of the review, Barkey was given a $ 0.40 raise, which was about a 1.8% increase.

On November 8, 2011, Heritage alleges that Hinrichs provided additional in-person counseling to Barkey. Barkey was allegedly reprimanded for openly discussing her displeasure with certain actions of Russell with her fellow employees. According to Heritage, Barkey was also reminded of the need to improve her attitude and approach to problems. Barkey denies that this counseling took place.

On January 20, 2012, Barkey received a written warning from Russell. This warning identified Barkey's communication style as being "uncaring and bothersome" as well as "demeaning and disrespectful." Also, the warning referenced that these issues had previously been addressed with Barkey and stated that "without immediate correction, termination will be warranted."

On April 16, 2012, Barkey received a written warning from Russell. This warning addressed a medication order error made by Barkey. Barkey admits that the warning was issued "because she failed to follow Heritage's medication standards: Barkey improperly indicated in a resident's records that Heritage had been administering a specific medication to that resident when that medication had not been available in the facility for a month."

On September 18, 2012, Barkey received a written warning from Havlik. Barkey admits that this warning "related to two separate instances in which Barkey made significant, and possibly health compromising, medication administration errors." The warning included the statement: "If further concerns regarding your performance are identified, your employment will be terminated."

Barkey began a second annual review process on October 6, 2012, by completing a BBB form. Hinrichs reviewed the BBB with Barkey on October 10, 2012. The BBB document indicated that a goal for Barkey was to "work on being defensive." Barkey was given a $ 0.30 raise, which was a 1.4% increase.

On June 17, 2013, Barkey had another in-person counseling with Havlik. Heritage alleges that the conversation centered on Barkey's attitude with staff and a specific instance in which Barkey delayed providing medication to a resident, thereby delaying when that resident could eat lunch. Barkey admits that a conversation occurred but denies that the conversation focused on her attitude and behavior.

On October 23, 2013, the Iowa Department of Inspections and Appeals (DIA) began an investigation at Heritage based on a self-report[1] and an anonymous third-party complaint. The investigation, which included observations, records review and staff and resident interviews, concluded on October 24, 2013. The DIA found that the complaints were unsubstantiated and the facility was in substantial compliance.

On October 25, 2013, Hinrichs and Havlik conducted an in-person meeting with Barkey. The substance of the conversation is disputed. Barkey alleges that Hinrichs said she knew Barkley had called the state (*i.e.,* the DIA) and that "she didn't want people that called state to be employed there anymore." Hinrichs and Havlik deny that any such statement was made and contend that it was Barkey who injected the DIA investigation into the discussion by stating that they "should be out trying to figure out who turned YOU in to state." According to Hinrichs and Havlik, they responded that they did not care who had called the state and that the discussion was not about that.

It is undisputed that during the October 25, 2013, meeting, Barkey was given another written warning addressing her poor attitude and habit of gossiping in the workplace. That warning referenced the June 17, 2013, verbal counseling, noting that the June discussion had focused on Barkey's attitude and behavior. The warning then identified a particular instance in which Barkey was allegedly asked by a nurse's aide why that aide needed to take a resident to the restroom and replied "[b]ecause she gets

---

[1] The self-report (#45752) involved an incident in which a resident fell.

4

crap all over her wound." Barkey acknowledges that the warning made reference to that alleged statement but denies that she made the statement.

Barkey alleges that after the October 25, 2013, meeting, Hinrichs and Havlik treated her "differently from other nurses by displaying intimidating behaviors and discouraging Barkey from taking time off for her husband's medical needs." For example, Barkey contends that when she requested a day off of work because her husband had an oncology appointment, Havlik "demeaned [her] about requesting that time off in front of people and then exposed why." Barkey alleges that just prior to this encounter with Havlik, a co-worker made a last-minute request for time off that was approved without an issue. Barkey also notes, and Heritage agrees, that she did not receive a BBB evaluation in 2013, as she had in the fall of 2011 and the fall of 2012.[2]

On the morning of December 15, 2013, Barkey was informed upon arriving at work that a resident had refused nighttime cares. Barkey entered the resident's room at 7:00 a.m. and again at 11:00 a.m. to administer medication to the resident. During Barkey's 11:00 a.m. visit to the room, the individual who possessed the resident's power of attorney was present. This individual went to the nurses' station at about 12:15 p.m. and advised Barkey that it appeared the resident had not received hygiene cares. While Barkey contends that she instructed Gaby Schwarck, a CNA, to check on the resident, Schwarck denies that this happened. The other CNAs who were on duty in that area of the facility also deny being instructed to check on the resident.

At 1:30 p.m., Barkey instructed one of the CNAs to check on the resident but another CNA responded to a call from the resident at about the same time. At 1:50 p.m., the CNA who responded called Barkey to the resident's room. Upon arrival,

---

[2] The record contains a BBB form for 2013 that includes Barkey's answers to various self-evaluation questions. However, it is undisputed that Heritage did not complete Barkey's annual review process in 2013.

Barkey found the CNA and the resident in the bathroom. The resident had areas of excoriation between her buttocks caused by the fact that she was soaked in her own urine. During a follow-up discussion with the CNAs on duty, Barkey learned that they had not communicated properly and each (incorrectly) believed that the other had provided hygiene and toilet cares to the resident.

Because the resident developed sores as a result of the incident, Heritage self-reported the incident to the DIA. The DIA conducted an investigation and determined that the resident had not been properly cared for. Heritage terminated Barkey's employment on December 20, 2013, and issued written warnings to the CNAs who were on duty when the incident occurred.

## IV.    SUMMARY JUDGMENT STANDARDS

Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one that "'might affect the outcome of the suit under the governing law.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "the substantive law will identify which facts are material." *Id.* Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.*

An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586–87 (1986)), or when "'a reasonable jury could

return a verdict for the nonmoving party' on the question," *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249–50, does not make an issue of material fact genuine.

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248–49. Essentially, a genuine issue of material fact determination, and thus the availability of summary judgment, is a determination of "whether a proper jury question [is] presented." *Id.* at 249. A proper jury question is present if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*

The party moving for entry of summary judgment bears "the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

In determining if a genuine issue of material fact is present, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at

587–88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376–77 (8th Cir. 1996).


## V.    ANALYSIS

Barkey contends Heritage wrongfully terminated her in violation of public policy because she made a "whistle-blower" report to DIA. Heritage argues that no causal connection exists between Barkey's report and her subsequent discharge.


### A.    *Applicable Law*

The parties agree that Iowa law controls this issue. The elements of the common law cause of action for discharge in violation of public policy in Iowa are: "(1) engagement in a protected activity; (2) discharge; and (3) a causal connection between the conduct and the discharge." *Fitzgerald v. Salsbury Chemical, Inc.*, 613 N.W.2d 275, 281 (Iowa 2000) (citing *Teachout v. Forest City Community Sch. Dist.*, 584 N.W.2d 296, 299 (Iowa 1998)). The Iowa Supreme Court has noted that "[t]he causation standard is high, and requires [the court] to determine if a reasonable fact finder would conclude [the employee's protected activity] was the determinative factor in the decision to discharge [her]." *Fitzgerald*, 613 N.W.2d at 289. A determinative factor is one that "tips the scales decisively one way or another." *Teachout*, 584 N.W.2d at 302 (quoting *Smith v. Smithway Motor Xpress, Inc.*, 464 N.W.2d 682, 686 (Iowa 1990)).

In 2015, the Court addressed the causation requirement in detail:

> [I]n order to prevail on a wrongful discharge claim in violation of public policy, the plaintiff must show the protected conduct was the determining factor in the adverse employment action. . . A determining factor is one that tips the balance in an employment decision. . . it is not necessary the protected conduct be the main reason behind the decision but it must be the factor that makes the difference in the employment outcome.

*Rivera v. Woodward Resource Center*, 865 N.W.2d 887, 898 (Iowa 2015) (internal citations and quotations omitted). In addition, the Court stated:

> [L]ack of legitimate business justification is not an element of the claim that the plaintiff must prove. . . Iowa law does not impose liability on an employer when the determining factor was a legitimate business reason and unlawful retaliation was simply a motivating factor.

*Id*. Finally:

> [T]he fact the plaintiff does not have the burden to show the employer lacked an overriding business justification does not mean evidence related to an employer's legitimate business reasons has no relevance in a wrongful discharge in violation of public policy case. Indeed an employer will prevail if it convinces the fact finder that the legitimate business reasons supporting the action were so strong as to defeat the conclusion that the protected conduct was the determining factor in the adverse employment decision.

*Id*. at 898-99. The Court has made it clear that "the protection afforded by anti-retaliatory legislation [or the common law] does not immunize the complainant from discharge for past or present inadequacies, unsatisfactory performance, or insubordination." *Hulme v. Barrett*, 480 N.W.2d 40, 43 (Iowa 1992); *see also Teachout*, 584 N.W.2d at 302 (quoting *Hulme*).

Here, the parties agree that for purposes of Heritage's motion: (1) Barkey reported alleged violations to the DIA, (2) her report was protected activity, (3) Barkey was later discharged and (4) her discharge constituted adverse employment action. Thus, the only element in dispute at this time is whether the summary judgment record contains sufficient

evidence to support a finding that Barkey's protected activity was the factor that "tip[ped] the balance" in Heritage's employment decision. *Rivera*, 865 N.W.2d at 898.

### B.    Analysis

Heritage argues that there is no genuine issue of material fact as to causation for two reasons.    First, Heritage alleges that Barkey cannot establish causation because she was discharged almost two months after her report to the DIA.    Second, Heritage argues that as a matter of law, Barkey was discharged for legitimate business reasons.

### 1.    Temporal Proximity

Heritage's first argument is that Barkey cannot establish causation because her discharge took place almost two months after the protected conduct.    Barkey's response is that there is no authority supporting Heritage's argument that the mere passage of time can preclude a wrongful discharge claim as a matter of law.    Barkey also contends that during the time between the protected conduct and her discharge, Hinrichs and Havlik engaged in other forms of retaliatory behavior.

In a slightly different context, the Iowa Supreme Court has stated:    "The mere fact that an adverse employment decision occurs after a charge of discrimination is not, standing alone, sufficient to support a finding that the adverse employment decision was in retaliation to the discrimination claim." *Hulme,* 480 N.W.2d at 43 (quoting *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1314 (6th Cir. 1989)).    The Court has applied this principle to public policy claims as well as to statutory discrimination claims.    *See Phipps v. IASD Health Services Corp.*, 558 N.W.2d 198, 203 (Iowa 1997).

However, the Court has never specified a particular amount of elapsed time after which causation cannot be found between protected conduct and an adverse employment action.[3]

Absent controlling Iowa precedent, I do not agree with Heritage that a period of just under two months is too long, *as a matter of law*, to support a finding of causation. This is especially true where, as here, Barkey has produced other evidence that – if believed – would suggest causation.[4] While the period of time between protected conduct and discharge is certainly a relevant factor, I must consider the entire record, and not simply count the days between the relevant events, to determine if a genuine issue of material fact exists for trial with regard to the causation element.

### 2.    *Legitimate Business Reasons*

Heritage's second argument is that Barkey's claim fails as a matter of law because there is overwhelming evidence that she was terminated for legitimate business reasons. Barkey does not have to prove a lack of business justification to prevail. *Rivera*, 865 N.W.2d at 898. However, a legitimate business justification can be so strong as to

---

[3] The Eighth Circuit Court of Appeals has addressed temporal proximity when analyzing federal employment discrimination claims that include similar causation elements. In *Smith v. Allen Health Systems, Inc.*, 302 F.3d 827 (8th Cir. 2002), the court ruled that a two-week interval was sufficient to allow an inference of causation. In *O'Bryan v. KTIV Television*, 64 F.3d 1188, 1194-95 (8th Cir. 1995), the court held that a three-month interval was not too long to permit a finding of causation when other acts of a retaliatory nature occurred between the protected conduct and discharge. However, in *Kipp v. Missouri Highway and Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002), the court overturned a verdict in favor of the plaintiff and held that an interval of two months "so dilutes any inference of causation that we are constrained to hold as a matter of law that the temporal connection could not justify a finding in [plaintiff's] favor on the matter of causal link." In *Kipp*, there appeared to be no evidence of other retaliatory acts during the two-month interval. *Id.* at 896-97.

[4] For example, and as noted above, Barkey has testified that Hinrichs stated she knew Barkey called the state that she "didn't want people that called the state to be employed there anymore." Doc. No. 20-3 at 51.

outweigh any inference that protected conduct was the determining factor in an adverse employment decision.  *Id.* at 899.

Barkey does not dispute that she had an extensive disciplinary history.  She was warned several times that she would be discharged if her performance and attitude did not improve.  The last of these warnings came on October 25, 2013, and included a statement that "if any credible issues are found within 90 days of this your employment will be terminated."  Doc. No. 19-3 at 13-15.  In addition, it is undisputed that Barkey was involved in an incident on December 15, 2013, in which a resident suffered injuries due to improper care.  As noted above, engaging in protected activity "does not immunize the complainant from discharge for past or present inadequacies, unsatisfactory performance, or insubordination."  *Hulme*, 480 N.W.2d at 42.  As such, Barkey's report to the DIA does not immunize her from being discharged for unsatisfactory performance.

Heritage argues that this case is similar to *Wusk v. Evangelical Retirement Homes, Inc.*, No. 15–0166, 2015 WL 9450914 (Iowa Ct. App. Dec. 23, 2015).  In that case, the plaintiff was fired over a year after filing a worker's compensation claim and over a month after the claim was settled.  *Id.* at *2.  At the time of discharge, the plaintiff had failed to schedule work shifts for nearly nine months after being cleared to return to work.  *Id.*  Additionally, there was no evidence that the supervisors who made the discharge decision knew about the worker's compensation settlement.  *Id.* at *5.  Under these circumstances, the Iowa Court of Appeals held that the temporal proximity between settlement and discharge was not enough to establish causation and that the employer had a legitimate business justification to terminate the plaintiff's employment.  *Id.* at *5.

*Wusk* is not nearly as persuasive as Heritage seems to think.  For starters, of course, it is an unpublished decision by an intermediate appellate court.   More

importantly, it is factually distinct. Barkey has presented evidence that, if believed, shows not only that her supervisors knew of her protected conduct, but also that one of them expressly stated that she "didn't want people that called the state to be employed there anymore." In addition, the temporal gap between the initial protected conduct and discharge in *Wusk* was more than a year. In this case, the gap was less than two months.

Ultimately, Heritage's "legitimate business reason" argument is a factual one. Heritage quotes *Rivera* for the proposition that "Iowa law does not impose liability on an employer when the determining factor was a legitimate business reason and unlawful retaliation was simply a motivating factor." Doc. No. 23 at 5 (citing *Rivera*, 865 N.W.2d at 899). On the same page, however, the Iowa Supreme Court stated: "Indeed an employer will prevail <u>if it convinces the fact finder</u> that the legitimate business reasons supporting the action were so strong as to defeat the conclusion that the protected conduct was the determining factor in the adverse employment decision." *Rivera*, 865 N.W.2d at 899 [emphasis added]. By moving for summary judgment, Heritage is asking me to find, *as a matter of law*, that Barkey's report to the DIA was not the determining factor in her discharge. In other words, I would have to find that there is no genuine, disputed issue of fact that Heritage would have discharged Barkey on December 20, 2013, regardless of whether Barkey made a complaint to the DIA.

Heritage has presented substantial evidence that Barkey was not a model employee. Thus, it is certainly possible that in my role as the finder of fact at trial, I will determine that Heritage had a legitimate business reason to terminate her employment. However, I cannot make that finding as a matter of law. Based on the evidence discussed in this order, Barkey has met her burden of presenting evidence that could lead to a reasonable inference that her report to the DIA was the determinative factor in her discharge. In addition to Hinrichs' alleged comment about not wanting people who called the state to be employed at Heritage, Barkey has testified that she was treated differently after the

report was made.   For example, she contends that she was castigated for requesting time off to accompany her husband to a medical appointment while another nurse was given time off without question.   Similarly, Barkey did not receive an annual review and pay increase in the fall of 2013, as she had in prior years. And, of course, the other employees involved in the December 15 incident received written warnings as opposed to being discharged.

Heritage either denies these allegations or provides explanations for them.   At this stage of the case, however, I cannot weigh the evidence or make credibility determinations.   Instead, I must view the summary judgment record in a light most favorable to Barkey and determine whether the finder of fact could conclude at trial that her report to the DIA was the determinative factor in her discharge.   Applying that standard, I must deny Heritage's motion.

## VI.  CONCLUSION

For the reasons set forth herein, defendant's motion (Doc. No. 19) for summary judgment is **denied**.   This case will proceed to trial as scheduled.


**IT IS SO ORDERED.**

**DATED** this 19th day of July, 2016.


_____
LEONARD T. STRAND
UNITED STATES DISTRICT JUDGE

14